We move to the fourth case this morning, U.S. v. Optical Systems. May it please the Court, I'm Raymond Bendig, I represent the two appellants, Vibgyor Optical and Bharat Verma, Vibgyor's corporation. Mr. Verma is essentially the corporation. The third defendant, his daughter, Urvasi Verma, is not part of this appeal, she did not appeal. What the appellants are requesting, I was not counsel in the district court, what the appellants are requesting is a remand to the district court for rehearing on the forfeiture issue. Mr. Verma's sentence, he did not appeal his sentence, which did involve a period of incarceration of eight months and three years of supervised release. He has served that sentence. And the issue goes strictly to the forfeiture amount, which the appellants, their position is that that was not properly or adequately determined in the district court. Mr. Verma and the corporation were represented by the same counsel, they did plead guilty, they waived appeal except for the issue of ineffective assistance of counsel. They did agree that there would be a forfeiture element and there would be a five-year cap on the potential period of incarceration. All three defendants were charged with conspiring to export and import defense articles without the proper written approval or licensing. That was in count one. Count four was just Mr. Verma and the corporation were charged with transmitting almost $9,000 to the Republic of China in violation of the U.S. munitions list, import list. Ms. Urvasi, she did go to trial. She was convicted and was sentenced to probation. The sentencing hearings were not for the, for the three defendants were bifurcated. Ms. Urvasi Verma was sentenced on August 16th of 2018. The corporation and her father, Mr. Verma, were sentenced the day before. The morning of August 15, an agent of the government, Mr. Kenneth Blank, testified for purposes of sentencing for all three defendants regarding the harm that these violations can bring to the United States of America. That was before lunch and then after lunch, the, on August 15th before Judge Bucklow, the proceedings only related to the forfeiture element as it related to Mr. Verma and the corporation and then Mr. Verma's actual sentencing, which he does not appeal. He is asking for a remand to the District Court for proper determination of the forfeiture amount. Now what we, Judge Bucklow had indicated previous to August 15 that there would be no continuances and the government was slow to disclose its figures, its calculations, and did not do so until a matter of a few days before August 15th. These calculations, these exhibits were the extensive exhibits that were used by the government in Ms. Verma's trial and Judge Bucklow did comment that she had never seen, as of yet, so many exhibits in a trial. Counsel, can I focus you a little bit here? Sure. So, as I understand it, you're arguing that counsel was deficient because she didn't seek a continuance to have more time to review these voluminous exhibits, correct? Thereby, yes, thereby conceding the government's calculations, which were. Well, she didn't concede the government's calculations. I mean, what she said to the District Court is that she had worked tirelessly, she pointed out the Tardy production, but she said she had worked tirelessly reviewing these documents and when you look at what she said at the hearing, I mean, she was clearly very familiar with the government's numbers and made sophisticated arguments trying to get them down and had some success. So, can you say a little bit more about why that actually was deficient performance? Because she did nothing to prove up the allegations of fact, the representation she had made in her memorandum in opposition of the government's forfeiture claim, which was filed only three days before the actual forfeiture hearing. So, it does appear, you are entirely correct, Your Honor, she was very prepared, but also noted that she had just gotten back from vacation as co-counsel. So, she had spent a lot of time with the government's numbers, but those were just the exhibits from the trial court. The government's memorandum, the government's motion seeking the forfeiture was filed on August 8th, just several days before the actual forfeiture hearing, and that memorandum is completely conclusory. It's in the wherefore paragraph at the end that the government articulates a number of almost $700,000 and dumps the trial exhibits from Ms. Verma's trial on defense counsel in that same proximity, but counsel's on vacation. So, she did invest herself into this once she returned, and she certainly wasn't lying about that when she said that, but if you look at the entirety of the transcript from the forfeiture hearing, the government's calculations, which were vague to begin with, were not adequately challenged, nor were Mr. Verma and the corporation's representations in their memo, their motion, proved up. Now, Mr. Verma is the corporation. You can tell from the transcripts. The other people who work for Vig Buer are family. This all fell to him. He was present. There was a lunch break. A recalculation by the government was tendered the day before the forfeiture hearing, so now we go from a situation where Judge Bucklow had stated that she would not grant any continuances to her, Judge Bucklow peppering the record with offers of continuances, and effectively the parties were saying, let's just get this over with, in so many words. Well, what did they whittle this down to? Is this supposed to be the profit made or the gross amount that they, I guess, paid or received? I don't exactly know what number we were looking for in the forfeiture. That's the problem, Your Honor. We don't know. The government's position was, we'll take what we think is the profit made off of the Chinese components, and we'll just take 20 percent off the top, and then they shortened the period of time in which that profit was made so that the number fell somewhat, significantly, but this business about taking 20 percent off of that just was pulled out of thin air. And then the defense position was, well, there were plenty of components that were manufactured by U.S. suppliers and placed into, assembled into these implements, and the corporation and Mr. Verma aren't being credited for that. So— What was the end product? The end product were optical systems, sight pieces for weaponry, tanks, planes, things of that nature. They were assembled by Vigbjor and Mr. Verma from components received, apparently, he did plead guilty. Are these telescopic or something? I think some might be. I mean, you just gave a pretty wide variety of products. And apparently it was. There just, there were a wide variety of products given over to different defense agencies under contract. And the whole point is they did this surreptitiously, getting Chinese products, I suppose, because they're cheaper. So they send certain, I guess, whatever you want to call it, component parts, a description, I guess, they're probably little pieces, and that's when they got caught doing that. Yes, Your Honor. Because they— Mr. Verma did plead guilty. He didn't want to give that stuff to the Chinese. It was sent, it was, it came back from China, there's, there was no technology shared with the Chinese. These were components. Well, whatever goes into, technology goes into components. Yes, Your Honor. So, the, Mr. Verma and the Corporation's position is that the Defense Council and the District Court effectively conceded the government's calculation, which was not properly proved up to begin with, and should have availed themselves of a continuance to properly prepare, their witness being Mr. Verma, who was the Corporation. Thank you. Thank you, Your Honor. May it please the Court, my name is Georgia Alexakis, and I represent the United States. This Court should affirm the District Court's determination that $430,701.12 should be forfeited from the defendants as a result of their criminal convictions. The defendants did not receive ineffective assistance of counsel with respect to the determination of that forfeiture amount. First, Defense Council's performance in the District Court throughout the sentencing proceedings was not deficient. Instead, what the record shows is that Defense Council vigorously challenged the government's proposed forfeiture amount. That forfeiture amount was disclosed to Defense Council 30 days before the sentencing hearing in a July 2018 submission in a supplemental government's version of the offense that was provided to Defense Council and to probation. And in that submission, the government provided in detail the methodology that it had used to reach that initial figure of $690,000, thereabouts, and it attached spreadsheets that substantiated that forfeiture amount. In response to that submission one month before the sentencing hearing, Defense Council raised an issue with the government's methodology, and that was with respect to this inventory of American-made parts that came from this company called FJW Industries. And Defense Council, because it had reviewed the government's methodology and understood it, recognized a potential pitfall in the methodology, which was to say that the government had not accounted for the fact that perhaps the defendants had been fulfilling their Defense Department contracts using American-made parts, for which they did not need to obtain licenses or permits in order to comply with the Arms Export Control Act. And so the government, in response to Defense Council's objection, modified its methodological approach. And then the day before the sentencing hearing, again responding to the defendants' argument, Defense Council's argument, produced a lower number, this $514,000 figure. The methodology, the modified methodology, was similar to what had already been described in July of 2018, except for the fact that the government essentially moved up the starting point of its analysis, and so essentially credited to the defendants a number of proceeds, business proceeds, even for a time period that was covered already by their criminal conduct. And so the point being is that Defense Council was far from deficient in their performance in the district court. This step alone indicated that they understood the government's methodology and effectively mounted a challenge to it, reducing the government's forfeiture amount from an initial figure of approximately $690,000 to $514,000. And then at the sentencing hearing itself, the Defense Council continued to evidence the fact that they were prepared to continue to challenge the government's proposed forfeiture amount. They thoroughly cross-examined, Defense Council thoroughly cross-examined the IRS agent who testified about the government's forfeiture calculations. They proposed an alternative forfeiture calculation, and as a result of these efforts, Defense Council extracted yet a second significant concession from the government at the sentencing hearing, further reducing the government's proposed forfeiture amount. So we started at $690,000. Before the sentencing hearing, the government lowered its forfeiture amount to $514,000. And then during the course of the sentencing hearing, based on a different challenge that the government's figures, the government made another compromise, and we moved toward the final figure then of $430,000, that forfeiture amount, which represents nearly a 40% reduction from the government's original proposed forfeiture figure. So again, far from being deficient, Defense Council's performance in the district court showed that they understood the methodology well enough to mount these challenges. Aside from deficiency, there's also this question of prejudice, which Defense Council really did not address in its opening arguments. Defendants have not shown that there's a reasonable probability here that they would have achieved a different outcome. They don't take the opportunity to look through these exhibits, now that there's been ample time since the sentencing hearing, to propose a number that the district court should have Instead, what they make are very general arguments about what could have been done, what should have been done, in order to reach a significantly lower number, without ever really identifying what that number should have been, what other methodology could have been used, what other evidence or what other witnesses could have testified at the hearing, or more specifically, what other testimony the district court could have heard that would have led the district court to adopt a different, lower number. Judge, you had a specific question about what we're looking for here. Are we looking at net proceeds or gross proceeds? And I wanted to direct the court to the statutory language, in particular, 18 U.S.C. section 981A2, in this context, defines proceeds as proceeds less direct costs. And so, in this type of case, where you have lawful goods that are being provided in an unlawful manner, proceeds for purposes of forfeiture is really profit. And the government incorporated that statutory requirement in its methodology, because it started with looking at the deposits into the defendant's bank account, and then subtracted from that number, after having isolated which deposits were related to its defense department work, subtracted from that number the cost of doing business. And frankly . . . Well, I assume the cost was lesser, otherwise, they wouldn't have gone to China to get it made. I'm sorry, Judge? I assume when they went to China, whatever the description of the product, I assume they're going to be paying less than they would be being done domestically, otherwise, why would they do it? Correct, Judge. I think that my understanding from the record is that the defendant's motivation in having these parts procured in China was because it was a lower cost to them. The problem is that they ran afoul of export and import laws that required them to obtain licenses and permits before they could export what we call the technical data, which is really like the blueprints for constructing these component parts in China. They didn't obtain the permission necessary to export that blueprint data to China, and they did not obtain permits or licenses in order to then import the finished products from China into the United States. And so they're doing all of this and supplying the Department of Defense with these parts that have been procured in China without disclosing the fact that all of this procurement work has been done without the necessary licenses and permits. And as the government pointed out— That saves some money in itself, I guess. It might save money for the defendants, but as the government argued at the sentencing hearing, there's a risk that it's compromising America's national security. For sure. It's secret. Correct. Where secret information is being provided to China without necessary government officials knowing that that's the case. And then there's nothing stopping China at that point from then transferring the knowledge that it has obtained from the defendants to any other country that China might be doing business with. And this wasn't just limited to eyepiece assemblies. There were a variety of military parts that the defendants were procuring and providing to the Defense Department. As the government notes in its brief, there were eyepiece assemblies, but also cannons, helicopters, mortar shells. It was quite a variety of military equipment that the defendants were obtaining in this criminal manner. All those products, all those helicopters and little things. I shouldn't dwell on this, but it just seems pretty amazing that they have that big an effect and they think they're making money on it. I hope they just think they're making money and this isn't something that they're cooperating with the enemy. That's all. It is an interesting set of facts, Judge. And I see my time is almost up. Unless there are any other questions from the panel regarding particularly the forfeiture amount or anything else related to the case, I will simply ask that the Court affirm the District Court's entry of this personal money judgment against the defendants in the specific amount. Thank you. Thank you, Counsel. Anything further? No, thank you, Your Honor. Thanks to both counsel and the cases taken under advisement.